UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JAMES E. DENHAM,
    Plaintiff,

Case No. 1:14-cv-611
Barrett, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the final decision of the Commissioner of Social Security (Commissioner) denying

plaintiff's applications for disability insurance benefits (DIB) and supplemental security income

(SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 15), the

Commissioner's response in opposition (Doc. 20), and plaintiff's reply memorandum (Doc. 21).

**I. Procedural Background**

Plaintiff filed applications for DIB and SSI in April 2008, alleging disability since

October 6, 2002, due to a heart condition, high blood pressure and cholesterol, and hearing

problems. (Tr. 379-83, 470). Plaintiff's applications were denied initially and upon

reconsideration. Plaintiff, through counsel, requested and was granted a de novo hearing before

administrative law judge (ALJ) Deborah Smith. Plaintiff and a vocational expert (VE) appeared

and testified at the ALJ hearing, which was held on June 22, 2010. (Tr. 134-50). The ALJ

continued the hearing to obtain medical expert (ME) testimony from a cardiologist. (Tr. 149-

50).[1] The second hearing was held on August 4, 2010. (Tr. 84-131). Plaintiff, medical expert

---

[1] At the conclusion of the hearing, the ALJ agreed to reopen an application for benefits filed by plaintiff in August
2004, which had been denied in December of 2004. (Tr. 148).

Dr. George M. Callard, M.D., and a VE testified at the hearing.

On August 18, 2010, ALJ Smith issued a decision denying plaintiff's DIB and SSI applications. (Tr. 158-71). The ALJ found that plaintiff suffered from a single severe impairment, a heart impairment. (Tr. 160). She restricted plaintiff to light work with a limitation against concentrated exposure to temperature extremes. (Tr. 165).

Upon request for review, the Appeals Council vacated the ALJ's decision on April 3, 2012, and remanded the matter to the ALJ. (Tr. 209-10). The Appeals Council found that the ALJ had failed to adequately articulate her reasons for assigning limited weight to the opinion of the consultative examining psychologist, Dr. Susan Kenford, Ph.D., in determininig the medical evidence of record did not support a finding of a severe mental impairment. (*Id.*). The Appeals Council stated that although the ALJ had found there was no actual or current diagnosis of anxiety or depression in plaintiff's medical history, Dr. Kenford had in fact diagnosed plaintiff with depression based on her clinical findings. (Tr. 209). In addition, the Appeals Council found that the ALJ had not adequately articulated her reasons for giving little weight to the opinion of state agency psychologist Dr. Leslie Rudy, Ph.D., which assessed moderate mental limitations. (*Id.*). The Appeals Council therefore remanded the matter for the ALJ to take the following action: (1) further consider Drs. Kenford and Rudy's opinions in accordance with the governing rules and regulations and explain the weight given this opinion evidence; (2) give further consideration to plaintiff's maximum RFC and provide appropriate rationale with specific references to the evidence of record in support of the assessed limitations; and (3) if warranted, obtain supplemental evidence from a VE to clarify the effect of the assessed limitations on plaintiff's occupational base. (Tr. 209-10). The Appeals Council noted as a final matter that plaintiff had filed subsequent applications for SSI and DIB benefits on December 13, 2010,

which were rendered duplicate by the Appeals Council's action with respect to the current claims. (Tr. 210). The Appeals Council therefore directed the ALJ to associate the claim files and issue a new decision on the associated claims. (*Id.*).

Following the Appeals Council's remand, an ALJ hearing was held on January 3, 2013. (Tr. 33-81). Plaintiff, lay witness Mary Theresa Halloran, and a VE testified at the hearing. On March 13, 2013, the ALJ issued a decision denying plaintiff's DIB and SSI applications. (Tr. 13-24). Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

3

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2007.

2. The [plaintiff] has not engaged in substantial gainful activity since October 6, 2002, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The [plaintiff] has the following severe impairments: history of coronary artery disease, status post stent placement; history of aortic valve replacement; major depressive disorder; anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with these specific limitations:

4

The [plaintiff] can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk about 6 hours in an 8 hour workday and sit about 6 hours in an 8 hour workday, with normal breaks. The [plaintiff] should avoid concentrated exposure to extreme heat and extreme cold. The [plaintiff] can never climb ladders, ropes or scaffolds. He can occasionally climb ramps and stairs. The [plaintiff] can perform simple and some multi-step tasks in a setting without demands for fast pace or high production. He can interact on a superficial level but would do best without demands for constant interaction with the general public. He can adapt to routine changes.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[2]

7. The [plaintiff] was born [in] . . . 1960, and was 42 years old (defined as a younger individual age 18-49) on the alleged disability onset date. The [plaintiff] subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from October 6, 2002, through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-24).

---

[2] Plaintiff's past relevant work was as an auto mechanic and preventive maintenance mechanic, skilled jobs which plaintiff performed at the heavy exertional level. (Tr. 22).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative unskilled light occupations such as shipping/receiving clerk (330,00 jobs in the national economy and 3,000 jobs in the local region) and courier/messenger (115,000 jobs in the national economy and 750 jobs in the local region). (Tr. 23).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

6

### D.  Specific Errors

On appeal, plaintiff alleges that the ALJ erred by: (1) issuing a mental residual functional

capacity (RFC) finding that is not supported by substantial evidence; and (2) determining that

plaintiff's physical RFC did not worsen following remand of the ALJ's first decision by the

Appeals Council.  (Doc. 15).  Plaintiff's first assignment of error is in actuality a claim that the

ALJ failed to properly weigh the mental health opinions of record.  The Court will construe and

analyze the claim as such.

### 1.  The ALJ did not err in weighing the mental health opinions.

Plaintiff argues that the ALJ erred in weighing the medical opinions related to his mental

impairments.  Specifically, plaintiff contends that the ALJ improperly discounted the opinions of

the two consultative examining psychologists, Dr. Kenford and Dr. Jessica Twehues, Psy.D., and

erroneously credited the opinion of state agency reviewing psychologist Dr. Leslie Rudy, Ph.D.

(Doc. 15 at 7-11).

Unless a treating source's opinion is given controlling weight, the ALJ will generally

give more weight to the opinion of a source who has examined the claimant than to the opinion

of a source who has not examined the claimant.  20 C.F.R. §§ 404.1527(c)(1)(2),

416.927(c)(1)(2).  However, the ALJ may reject any opinion of record if the opinion is not well

supported by the findings or is inconsistent with the record.  *Norris v. Comm'r of Soc. Sec.*, 461

F. App'x 433, 440 (6th Cir. 2012) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514-15 (6th

Cir. 2010)).  Where, as here, there is no opinion by a treating source as to a plaintiff's mental

functional capacity, the ALJ should weigh the medical opinions of record based on the source's

examining relationship (or lack thereof), specialization, consistency, supportability of the

opinion, and other factors "which tend to support or contradict the opinion."  20 C.F.R. §§

404.1527(c), 416.927(c). *See also* SSR 96-6p, 1996 WL 374180 (July 2, 1996).[4] However, in such circumstances, "[s]o long as the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements to survive [the federal court's] review." *Norris*, 461 F. App'x at 440.

Dr. Kenford evaluated plaintiff on June 11, 2008. (Tr. 848-54). Dr. Kenford noted that she had received no doctor's reports or other independent sources of information regarding plaintiff, with the exception of a one-paragraph hospital discharge summary dated August 2007. (Tr. 848). Beyond this, all of the information she received for review was self-reported. Dr. Kenford opined that plaintiff's reliability as a historian was limited. She noted that he did not engage with her, he presented as somewhat guarded and defensive, and he displayed an irritated affect. (Tr. 848, 850). Plaintiff reported that he drove himself to the evaluation, although he typically had a friend drive him where he needed to go. Plaintiff reported that he had contact with his mother once a week, he had limited to no contact with his siblings, he had been living with his son and his son's girlfriend for the past seven to eight months, and he spoke with his daughter. (Tr. 848-49). Plaintiff reported that his only source of pleasure was spending time with his children. (Tr. 850).

Plaintiff reported receiving treatment for his heart impairment since 2001, but he denied any past or current mental health treatment. (Tr. 849). He reported feeling depressed and worried since he was a child. (Tr. 850). Plaintiff stated that his doctor had prescribed Paxil and Clonazepam for him but the medications "made [him] feel worse" so he stopped taking them.

---

[4] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner. 20 C.F.R. § 402.35(b)(1)." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 n.1 (6th Cir. 2010). The Sixth Circuit has refrained from ruling on whether Social Security Rulings are binding on the Commissioner in the same way as Social Security Regulations but has assumed that they are. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2001)).

(*Id.*). When asked about suicide, he reported that he had twice "put a gun in [his] mouth" but his son stopped him and took the bullets away. (*Id.*). Plaintiff cried when he related this and reported that he cried "all the time" at home. (*Id.*). Plaintiff reported that his energy level was "okay-I can walk." (*Id.*). Plaintiff denied any subjective anxiety and Dr. Kenford did not observe any during the evaluation. Plaintiff reported problems with frustration tolerance and getting upset daily. He reported that he got along well with everyone except some family members. (Tr. 851).

Dr. Kenford described plaintiff's daily activities as follows:

Claimant is able to physically wash, dress and attend to his personal hygiene needs. He reported he showers daily. He gets up at 7:00-7:30, goes to the bathroom, washes his hands, brushes his teeth and combs his hair. He then takes his medications. He will eat breakfast and drink coffee. He then watches television until a friend comes over to take him out. He leaves and spends the day with his friend. He returns at night, takes his evening medication and goes to bed. He reported that his social supports are three good male friends; he has near daily to daily contact with them. He also has his daughter. He indicated he is satisfied with his social supports. He does limited grocery shopping and reported "I eat whatever I can get." He does little cooking and eats a lot of fast food. He indicated he does no cleaning at the house as "I'm never there-all I do is sleep there." He does his own laundry. He reported at this time he has no sources of income. He gets no benefits. His son and/or his friends give him money.

(Tr. 852).

Dr. Kenford noted that plaintiff had not sought any type of mental health treatment and he felt his medications were not helpful. She opined that "[g]iven his attitude during this evaluation, it is felt that he would likely not cooperate with therapy-especially if the therapist was a woman." (Tr. 851-52).

Dr. Kenford diagnosed plaintiff with a major depressive disorder, chronic, and report of cardiac problems and hypertension. She assigned a Global Assessment of Functioning (GAF)

score of 40.[5] Dr. Kenford rated plaintiff's ability in the four work-related areas of mental functioning as follows: (1) plaintiff's ability to get along with others, including co-workers and supervisors, is markedly impaired by his depression as plaintiff showed limited social skills and interest, he became quickly irritated if asked to do anything that required effort or that he considered to be unimportant, and his "abrasive manner" would likely prove difficult for co-workers and supervisors; (2) plaintiff's ability to maintain attention, concentration and persistence is mildly impaired; (3) plaintiff's ability to perform simple repetitive tasks is mildly impaired by his depression; and (4) plaintiff's ability to handle the stresses and pressures of an everyday work environment is markedly impaired as plaintiff requires mental health treatment, he would feel rapidly overwhelmed if placed in a "stressful or pressure filled environment," and he would cope with feeling overwhelmed by becoming irritable and lashing out at others. (Tr. 853).

Dr. Twehues evaluated plaintiff on February 14, 2011. (Tr. 987-991). She opined that plaintiff was a reliable historian. Plaintiff reported that he drove himself to the evaluation. (Tr. 987). He stated that he was homeless and was staying intermittently with different friends. Plaintiff reported that he had not seen his mother in a while but that he was close with his two brothers, he was close with his adult son and daughters, and he had been very close to his deceased father. Plaintiff reported that he did not participate in mental health treatment, he had never been hospitalized for psychiatric reasons, and he had attempted suicide twice, most

---

[5] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." Id. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). Id. at 34. Scores of 31-40 indicate "[s]ome impairment in reality testing, or impairment in speech and communication, or serious impairment in several of the following: occupational or school functioning, interpersonal relationships, judgment, thinking, or mood." Id. at 32.

recently one year earlier. (Tr. 988). He denied suicidal intent or plan or homicidal ideation. Plaintiff reported that he spent his time visiting his children and watching television, he drove sometimes, he picked up after himself but performed no other chores, he could care for himself and bathed regularly, and he had one close friend he saw often.

At the evaluation, plaintiff was cooperative and rapport was easily established. His hygiene was poor and his clothes were soiled. (Tr. 988). His gait was slow and he exhibited nonverbal pain behaviors. His mood appeared depressed and he reported feeling depressed most of the time over approximately the past ten years, the period during which he had experienced heart problems. (Tr. 989). He reported having difficulty sleeping. He reported worrying often, crying easily, and being easily irritated. He did not present as anxious and there was no indication of obsessions, compulsions, paranoid ideation, delusions, or hallucinations. He was oriented. Dr. Twehues opined that plaintiff would likely cooperate in and benefit from a treatment program.

Dr. Twehues diagnosed plaintiff with a major depressive disorder, recurrent, severe, without psychotic features, and assigned a GAF score of 50.[6] (Tr. 990-91). She noted that plaintiff complained of depression, disturbed sleep and appetite, a tendency to worry and to cry easily, limited energy and fatigue, and suicidal ideation, and he appeared to display anhedonia and irritability; however, from a functional standpoint, he cleaned up after himself, tended to personal self-care and bathed regularly, had one friend with whom he was close, was close with his children and brothers, and stayed intermittently with different friends. (Tr. 990). She rated him in the four work-related areas of mental functioning as follows: (1) plaintiff's mental ability to relate to others, including fellow workers and supervisors, appeared to be markedly impaired by depressive symptoms, and he would likely have significant difficulty relating adequately to

---

[6] The DSM-IV categorizes individuals with GAF scores of 41-50 as having "serious" symptoms. DSM-IV, p. 34.

others in the workplace; (2) plaintiff's mental ability to understand, remember and follow simple instructions did not appear to be impaired, and he may have moderate difficulty with complex instructions due to depressive symptoms; (3) plaintiff's mental ability to maintain attention and concentration and persistence and pace in task completion appeared to be moderately impaired by depressive symptoms as his attention and concentration skills were marginally adequate during the evaluation; and (4) plaintiff's mental ability to withstand the stress and pressure associated with day-to-day work activities appeared to be markedly impaired by depressive symptoms. (Tr. 991).

State agency reviewing psychologist Dr. Rudy reviewed the medical evidence of record for the state agency and completed a mental RFC assessment and a Psychiatric Review Technique on July 7, 2008. (Tr. 866-883). Dr. Rudy diagnosed plaintiff with a major depressive disorder. (Tr. 873). Dr. Rudy assessed plaintiff with mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration. (Tr. 880). Dr. Rudy opined that plaintiff's presentation at Dr. Kenford's evaluation did not appear to be an accurate portrayal of his current functional status. (Tr. 868). Dr. Rudy noted that plaintiff reported he enjoyed multiple activities but limited himself because of the side effects of his medication, and he also reported socializing with his friends daily, visiting a sister regularly, and attending church infrequently. (*Id.*). Dr. Rudy found that plaintiff had only moderate limitations in adjusting to stress and maintaining concentration, persistence and pace because he was able to engage in a variety of activities, and hospital treatment notes indicated his mood and affect was appropriate. (*Id.*). In addition, despite plaintiff's reports that he cried all the time at home and felt miserable and suicidal, he did not report symptoms of tearfulness or feeling

12

suicidal on his function or symptom reports and the primary care physician's notes did not document allegations or observations of these symptoms.  (*Id.*).  Finally, Dr. Rudy explained that both the third-party and plaintiff's reports of functioning suggested no more than moderate limitations in social interactions and stress tolerance given that plaintiff had contact with friends and relatives daily with no reported problems and he had no history of emergency room visits, psychiatric hospitalizations, or decompensations.  (Tr. 868-69).  Dr. Rudy concluded that plaintiff retained "the capacity for simple and some multistep tasks in a setting without demands for fast pace or high production.  He can interact on a superficial level but would do best without demands for constant interaction with the general public.  He can adapt to routine changes."  (Tr. 869).  On reconsideration, Dr. Joan Williams, Ph.D., affirmed Dr. Rudy's assessment as written. (Tr. 892).

The ALJ gave "little weight" to the assessments and opinions of consultative examining psychologists Drs. Kenford and Twehues.  (Tr. 21).  The ALJ discounted Dr. Kenford's opinion that plaintiff's depression markedly limited his ability to get along with others and to handle the everyday stress and pressure of a work environment on the grounds: (1) Dr. Kenford had evaluated plaintiff on only one occasion; (2) she found plaintiff to be an unreliable historian; and (3) plaintiff's presentation at the evaluation did not appear to accurately portray his functional status.  (Tr. 21-22).  The ALJ discounted Dr. Twehues' findings on the grounds they were inconsistent with the information in her report and other evidence in the file.  (*Id.*).  Specifically, although Dr. Twehues found marked impairment in social functioning, she also noted that plaintiff was close to his brothers, he had been very close to his deceased father, he was very close to his two adult children and spent time visiting with them, he spent time with different friends, and he had one close friend.  Further, although Dr. Twehues found marked decrease in

stress tolerance, plaintiff had not been in any mental health treatment and when he was prescribed psychotropic medication, he quickly stopped taking it and did not try to see if another medication could help.  Further, the ALJ noted that Dr. Twehues apparently relied on plaintiff's subjective statements that he was "depressed, easily irritated and has limited energy" despite her findings that plaintiff was alert, responsive, and fully oriented, his memory was adequate, and he was capable of managing his own funds and physicians' reports in the treatment notes that psychological findings were unremarkable or negative and plaintiff displayed normal mood and affect.  (Tr. 22).

Rather that crediting the one-time examining psychologists' opinions, the ALJ gave "great" weight to Drs. Rudy and Williams' assessments that plaintiff had the mental functional capacity to perform "simple and some multi-step tasks in a setting without demands for fast pace or high production"; plaintiff "could interact on a superficial level but would do best without demands for constant interaction with the general public; and he could adapt to routine changes." (Tr. 21, citing Tr. 869).  The ALJ found that Drs. Rudy and Williams' opinions were the most consistent with the overall record, and in particular the treating providers' "repeated documentation of normal or unremarkable psychological findings."  (Tr. 21).  In making her determination, the ALJ specifically relied on the findings in the treatment notes of plaintiff's treating physician; inconsistencies between reports of plaintiff's functioning and the assessment of marked limitations; and plaintiff's failure to pursue mental health treatment.  These are valid reasons for crediting the opinions of the nonexamining psychologists over the reports of the one-time examining psychologists. *See Norris*, 461 F. App'x at 440 (citing *Ealy,* 594 F.3d at 514-15) ("upholding ALJ's decision not to give weight to nontreating source because the opinion was inconsistent both with source's own findings as well as the overall record").

14

Plaintiff challenges the ALJ's decision to credit the opinions of the nonexamining state agency psychologists on several grounds. (Doc. 15 at 7-11). First, plaintiff briefly asserts that Drs. Kenford and Twehues' opinions "arguably meet Listing 12.04, which would require an automatic award of benefits." (*Id.* at 8). Plaintiff has waived this argument by alluding to it in a barebones and perfunctory manner. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) ("issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (quoting *United States v. Elder,* 90 F.3d 1110, 1118 (6th Cir. 1996)).

Further, plaintiff suggests that the ALJ was bound to credit the opinions of Drs. Kenford and Twehues because these psychologists are the only examining mental health providers of record. (Doc. 15 at 9). However, the ALJ was not required to credit Drs. Kenford and Twehues' opinions over the opinions of the nonexamining psychologists simply because they saw plaintiff once for evaluation purposes. Although the regulations provide that "[g]enerally . . . more weight [will be given] to the opinion of a source who has examined [a claimant] than to the opinion of a source who has not examined [the claimant]," an opinion from a nonexamining source, such as a state agency reviewing psychologist, may "in appropriate circumstances" be given greater weight than that of an examining or treating source. *Blakley,* 581 F.3d at 409 (quoting Social Security Ruling 96-6p, 1996 WL 374180, at *3).[7] *See also Norris,* 461 F. App'x

---

[7] Plaintiff relies on two District Court cases for the proposition that it was incumbent upon the ALJ to credit the opinion of the examining "specialists" that plaintiff is disabled because no other examining source issued an examination, report, or other evidence that contradicted these opinions. (Doc. 21 at 2-3, citing *Lingo v. Sec'y of Health & Human Servs.*, 658 F. Supp. 345, 349 (N.D. Ohio 1986); *Boyd v. Sec'y of Health & Human Servs.*, 626 F. Supp. 1252, 1254 (W.D. N.Y. 1986). Neither of these cases is remotely applicable here. In *Lingo,* the only mental health source who issued an opinion on plaintiff's mental functioning was a one-time examining psychologist; plaintiff's mental health records were not reviewed by a nonexamining psychologist. In *Boyd,* the Court found that "virtually all of the examining physicians agree that plaintiff is incapable of doing even low stress gainful activity" and there was no mention of a nonexamining medical source. 676 F. Supp. at 1254.

15

at 439-40.  Such circumstances are present here.  The ALJ thoroughly reviewed the record, weighed the regulatory factors, and gave valid reasons for crediting the nonexamining psychologists' opinions over those of the examining psychologists.

Plaintiff also alleges that the ALJ erred by crediting Dr. Rudy's opinion over the assessments of the examining psychologists because Dr. Rudy reviewed the file in 2008, which was five years before the ALJ issued her decision, and Dr. Rudy did not have the opportunity to review the bulk of the medical records in this case.  (Doc. 15 at 8).  However, plaintiff has not shown that the record includes material evidence related to his mental impairments that post-dates Dr. Rudy's decision and that the reviewing psychologist failed to take into account, with the exception of the 2011 assessment of Dr. Twehues.  Plaintiff has stressed, however, that Dr. Twehues' assessment is "virtually identical" to the assessment of Dr. Kenford, which was issued in June 2008, shortly before Dr. Rudy's review.  (Doc. 15 at 11).  Dr. Rudy had Dr. Kenford's assessment before her when she performed her review in July 2008 and thoroughly considered the information included in Dr. Kenford's assessment.  Plaintiff does not allege that Dr. Twehue's subsequently issued assessment includes any additional information related to his mental functioning that Dr. Rudy should have considered.  Further, plaintiff has not cited any evidence of mental health treatment, psychiatric hospitalizations, or abnormal psychological findings that indicate his mental condition deteriorated following Dr. Rudy's assessment. Accordingly, the ALJ did not err by relying on Dr. Rudy's assessment on the ground it predates the ALJ's decision by several years.[8]

---

[8] Plaintiff briefly suggests that the ALJ also erred by rejecting Dr. Rudy's opinion in the first unfavorable ALJ decision but crediting the opinion in the decision that is the subject of this appeal.  (Doc. 15 at 10; Doc. 21 at 3). Plaintiff has not developed this argument to any extent or supported it with citations to the record and has therefore waived it.  *Kennedy*, 87 F. App'x at 466.

In addition, plaintiff alleges that the ALJ erred by relying on the observations of plaintiff's treating cardiologist, Dr. Stewart-Dehner, to discount Drs. Kenford and Twehues' opinions. (Doc. 15 at 10). Plaintiff alleges that Dr. Stewart-Dehner's notations of normal mood and affect do not constitute substantial evidence in support of a nondisability finding because the examining psychologists evaluated plaintiff's "mood much more closely" than did plaintiff's treating cardiologist, "who was mostly concerned about heart issues." (*Id.*). Plaintiff's allegations regarding the nature of Dr. Stewart-Dehner's observations as compared to those of the one-time examining psychologists are mere speculation. Plaintiff does not cite any evidence to support his assertions. In any event, the ALJ is not precluded from considering a treating physician's observations of a patient's mental status simply because the physician specializes in a field other than psychology. *See Norris*, 461 F. App'x at 439-40 (ALJ properly relied on the treating physician's treatment notes, which contradicted the one-time examining psychologist's assignment of a GAF score of 31 and did not reference plaintiff's complaints of post-traumatic stress, memory problems, dementia, or auditory hallucinations which plaintiff presented to psychologist). Here, substantial evidence supports the ALJ's finding that the treatment notes of Dr. Stewart-Dehner and the other physicians of record are inconsistent with plaintiff's complaints of disabling mental impairments. Those treatment records document normal psychological findings over a period of several years. For example, no diagnosis of depression or anxiety was made when plaintiff was admitted to the hospital in April 2010 for bronchitis, plaintiff's affect, judgment and mood were noted to be normal, and he was alert and oriented. (Tr. 21, citing Tr. 922). Similarly, plaintiff was not diagnosed with depression or anxiety during a December 2010 emergency room visit. (*Id.*, citing Tr. 947). In addition, normal mood and affect were reported when plaintiff made visits to Dr. Stewart-Dehner's cardiology practice in

17

December 2010, January 2012, and July 2012. (*Id.*, citing Tr. 976- "The patient is alert and oriented to time, person and place. The patient's mood is appropriate"; Tr. 1006- "Oriented to Time Person, Place. Mood- Approp[]riate."; Tr. 1191- "Mood, memory, affect and judgment normal."). *See also* Tr. 895, 897, 901, 913 (cardiology visits from November 2008, May 2009, November 2009, and May 2010 showing same). The ALJ reasonably relied on the normal and unremarkable psychological findings in the physicians' records to credit Drs. Rudy and Williams' assessment of plaintiff's mental functioning as no more than moderately impaired. (Tr. 21).

Plaintiff further alleges that the ALJ erred by "inappropriately" focusing on the fact that plaintiff got along well with his family to reject the examining psychologists' opinions. (Doc. 15 at 9). Plaintiff alleges that simply because a person is close to his family does not mean he can function with others in a "stressful job setting." (*Id.*). Plaintiff contends that both of the examining psychologists had the opportunity to view him in an exam setting, which "would be similar to a job experience," and "both felt he did not have the demeanor to relate well in the job arena." (*Id.*). However, the ALJ rejected the examining psychologists' finding of marked impairment in social functioning based on more than just plaintiff's close relationship with his brothers and his two children. The ALJ also considered plaintiff's relationships with his friends and the fact that plaintiff was cooperative with Dr. Twehues and rapport was easily established. (Tr. 22). The ALJ reasonably determined that plaintiff's "rather normal functioning in this regard" was inconsistent with Dr. Twehues' finding of "marked decrease in social functioning." (*Id.*). *See Hogg v. Sullivan*, 987 F.2d 328, 333 (6th Cir. 1993) (evidence did not show that the plaintiff had marked difficulties in social functioning where she attended church and visited relatives, and the treating psychiatrist reported on several occasions that she related well toward

others).[9]

In addition, the ALJ reasonably relied on plaintiff's own Adult Function Report and the Third-Party Function Report completed by his father, Matthew Denham, to reject Drs. Kenford and Twehues' findings of marked limitations in social functioning and to adopt the nonexamining psychologists' assessment of moderate limitations in this area. (Tr. 21, citing Tr. 450-59, 460-68). A review of plaintiff's Function Report completed on April 14, 2008, discloses that plaintiff engaged in a significant amount of social interaction and had few, if any, problems in this area of functioning. Plaintiff reported that he lived with his son and his son's girlfriend. (Tr. 452). Plaintiff reported that his daily routine included going to a friend's house at some point after breakfast and returning home around 5:00 to 6:00 p.m. (Tr. 453). Plaintiff indicated that if his son's girlfriend was not cooking, the three of them went out to eat. (Tr. 454). Plaintiff explained that he went outside every day unless it was raining or cold and that he was able to drive. (Tr. 455). Plaintiff reported that he spent time with others every day riding in their car or truck, meeting with them and "hang[ing] out," and going to a restaurant for coffee and to talk. (Tr. 456). Although plaintiff indicated that he had problems getting along with others, understanding, and completing tasks, he attributed these issues to physical symptoms only. (Tr. 457). Plaintiff reported that he did not get along with his older sister, who "stress[ed] him out," and indicated he stayed away from her. (Tr. 456). Plaintiff reported that he got along "ok" with authority figures and did not get aggravated or excited; however, if he did experience these feelings, he would walk away. (Tr. 457). Plaintiff did not mention depression or anxiety in his Function Report or relate feeling anxious or depressed.

---

[9] Plaintiff alleges that *Hoggs* is inapposite because a treating psychiatrist in that case reported on several occasions that plaintiff related well toward others, whereas no examining physician in this case offered evidence that contradicts the examining psychologists' opinions that plaintiff had marked restrictions in social functioning. (Doc. 21 at 4). Plaintiff's argument ignores the fact that the ALJ here cited substantial evidence to support her opinion that plaintiff does not have marked limitations in this area of functioning.

Similarly, plaintiff's father did not report symptoms of difficulties in the area of social functioning in the Third-Party Function Report he completed on April 16, 2008.  To the contrary, plaintiff's father reported that he spent five to six hours a day watching television with plaintiff and visiting family with him.  (Tr. 461).  He also reported that plaintiff went outside three to four times a day and travelled on foot or by car.  (Tr. 464).  He described plaintiff as spending time sitting and talking with others every day and going to friends' homes on a regular basis and to church on occasion.  (Tr. 465).  Plaintiff's father indicated that plaintiff had problems with memory, concentration, completing tasks and following instructions due to physical symptoms, but he did not indicate plaintiff had problems getting along with others.  (Tr. 466).  He reported that plaintiff finished what he started, he followed written instructions well, he got along "well" with authority figures, and he handled changes in routine "ok," although he did not handle stress well.  (Tr. 466-67).

Thus, the evidence of record substantially supports the ALJ's decision to adopt Dr. Rudy's assessment that plaintiff "could interact on a superficial level but would do best without demands for constant interaction with the general public."  (Tr. 869).  Substantial evidence likewise supports the ALJ's decision to reject Dr. Twehues' finding that plaintiff was markedly limited in his ability to tolerate stress and to instead adopt the following restrictions assessed by Dr. Rudy:

> [P]laintiff can perform simple and some multi-step tasks in a setting without demands for fast pace or high production.  He can interact on a superficial level but would do best without demands for constant interaction with the general public.  He can adapt to routine changes.

(Tr. 19).  In making this finding, the ALJ relied on the information in the reports of functioning; plaintiff's failure to seek mental health treatment; and his treating physicians' negative

psychological findings. (Tr. 21). These are valid reasons for crediting Dr. Rudy's opinion over the assessment of the examining psychologists. Plaintiff has not shown any error in this regard.

Plaintiff challenges the ALJ's reliance on his failure to obtain treatment for serious psychological symptoms to find that Drs. Rudy and Williams' reports were most consistent with the overall record. (Doc. 15 at 10). Plaintiff alleges this is not an appropriate reason to reject "well considered specialist opinions" and that the ALJ's decision is improper in this regard because "the record is clear that [plaintiff] could not afford such treatment." (*Id*. at 9-10). Sixth Circuit law is clear that "ALJs must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state. For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Social Security*, 572 F.3d 272, 283 (6th Cir. 2009) (quoting *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (listing cases recognizing that a mentally ill person's noncompliance with treatment "can be . . . the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse") (citations, internal quotation marks, and brackets omitted)). Nonetheless, the presence of a severe mental impairment does not automatically justify a claimant's failure to adhere to a medical regime, including prescription psychiatric medications; rather, "the record must contain evidence expressly linking noncompliance with the severe mental impairment." *Burge v. Comm'r of Soc. Sec.*, 1:13cv87, 2013 WL 6837192, *4 (N.D. Ohio Dec. 26, 2013); *Ross v. Comm'r of Social Security*, No. 1:12-cv-543, 2013 WL 1284031, at *13 (N.D. Ohio Mar. 26, 2013). A lack of funds may likewise justify noncompliance with a medical regimen. *Burge*, 2013 WL 6837192, at *4. Whether the reason is a severe mental impairment or a lack of funds, the claimant bears the burden of proof to show that his failure to comply with a medical regimen was justified. *Id*.

Here, plaintiff has not met his burden to show that his failure to seek mental health treatment or to comply with a psychiatric medication regime was justified by either his mental impairment itself or his financial situation.  There is no information in the record that shows plaintiff' mental impairment precluded him from obtaining treatment.  Further, plaintiff has not demonstrated that he was unable to obtain mental health treatment due to a lack of financial resources.  Plaintiff testified that he was not consistently insured.  (Tr. 40-41).  Plaintiff nonetheless was able to obtain health insurance and medication to treat his depression for a brief period of time.  (Id.).  Plaintiff testified that he obtained health insurance and was seen at the Mt. Auburn Neighborhood Health Center earlier in 2012, where he was prescribed Fluoxetine, a drug that is used to treat major depression.[10]  (Tr. 56).  However, plaintiff testified that he stopped taking the drug because it made him "feel worse . . . feel bad, feel funny."  (Tr. 56-57).  Plaintiff acknowledged that he does not think he took the medication long enough for it "to really take effect."  (Tr. 56).  Thus, according to plaintiff's own testimony, he opted not to follow the treatment regimen for reasons other than a lack of financial resources.  Plaintiff testified that he stopped going to the Health Center because his insurance was discontinued, but he did not indicate when this occurred or whether he pursued other treatment options.  (Tr. 57).  Plaintiff testified at the hearing that he was able to obtain health insurance on and off, he had obtained treatment at the Mt. Auburn Health Center treatment at some point since April before the hearing, and he was being treated by Dr. Stewart-Dehner at the time of the hearing.  (Tr. 40-41).  Plaintiff's testimony does not establish that he was unable to obtain mental health treatment due to a lack of financial resources.  The ALJ thus properly relied on plaintiff's failure to seek mental health treatment and to continue on a prescribed medication regimen to discount the examining psychologists' findings of marked impairment.

---

[10] http://www.drugs.com/fluoxetine.html.

For these reasons, the ALJ did not err by crediting the opinions of the non-examining state agency psychologists Drs. Rudy and Williams over the opinions of the one-time examining psychologists Drs. Kenford and Twehues. The ALJ thoroughly considered the medical opinions and other evidence of record. The ALJ gave valid reasons for affording the greatest weight to Drs. Rudy and Williams' opinions and for incorporating the mental limitations they assessed into the RFC finding. The evidence of record substantially supports the ALJ's finding. Plaintiff's first assignment of error should be overruled.

### 2. The ALJ did not err in assessing plaintiff's physical RFC.

Plaintiff alleges as his second assignment of error that the ALJ erred by determining his physical RFC did not worsen following remand by the Appeals Council. (Doc. 15 at 11). Plaintiff alleges that following the remand, new clinical findings and diagnoses were made of "1-2+ aortic insufficiency," moderate mitral regurgitation, "3/6 murmur and contractions," atrial contractions, and aortic regurgitation. Plaintiff alleges that if the ALJ found him capable of light work with certain environmental restrictions in her first decision and his condition worsened by the time of her second decision, then the ALJ should have accounted for his diminished physical capabilities in the post-remand RFC finding. The Commissioner argues in response that plaintiff has not explained how any of the evidence he has recited resulted in additional limitations which the ALJ failed to include in the RFC finding. (Doc. 20 at 10).

Disability is determined by the functional limitations a condition imposes, not the mere diagnosis of a condition. *See Higgs*, 880 F.2d at 863; *Foster v. Bowen*, 853 F.2d 483, 488-89 (6th Cir. 1985). Plaintiff has not presented any evidence to show that the clinical findings and diagnoses he has listed imposed additional functional limitations that the ALJ failed to take into account in formulating the physical RFC. Plaintiff's mere recitation of clinical findings and

diagnoses is meaningless absent evidence showing that the findings and diagnoses impose any such limitations. Plaintiff's second assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **AFFIRMED** and this matter be **CLOSED** on the docket of the Court.

Date: _9/18/15_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JAMES E. DENHAM
Plaintiff,

Case No. 1:14-cv-611
Barrett, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).